May it please the Court, Charles Bonneau, attorney for Lloyd Philip Locke, appellant and petitioner. Your Honors, the issue that comes before the Court today has to do with the admissibility of the defendant's confession, which we challenge for two reasons. One is that there was a valid invocation of the Miranda privilege followed by an involuntary and inadequate waiver. The second aspect of the argument is that the confession which followed was coerced and involuntary. And I'd like to focus on the second of those arguments, the involuntary and coercive nature of the interrogation that led to the confession. And the overwhelming aspect of the argument today is that there was an involuntary consent to search that was signed by the defendant at 7 p.m. It was held to be involuntary. It was held to be a result of police badgering. He was then kept in the same interrogation room for two, upwards of two hours, about two and a half hours, when the same detective returned and with a reprise of the prior engagement proceeded to interrogate the defendant and extract a Miranda waiver. And the difficulty that we have in this case is that an involuntary, coerced consent to search cannot be suddenly become or be followed by a voluntary agreement to talk and to confess to the crime. The state... Why not? Why not? Because the state has to point to some evidence of change in the situation. Well, the guy was swift when he came in and said he didn't understand his Miranda rights to begin with. The police officers observed that he was pretty unstable, so they let him dry out. And a couple, two and a half hours later, he appears to them and whatever to be fine and to get it. And you read the transcript and it appears that he was perfectly willing to talk and did and talked to them with their first name and blah, blah, blah. The first police contact was after 3 p.m. in the afternoon. And he was pulled over on a motorcycle. He was not cited for DUI. The officer did not conclude that he had a blood alcohol level over .08 percent. They were arresting him for everything that they could short of the sex offense, but they did not cite him for driving under the influence. To the extent that he was under the influence, the interrogation proceeded after 7 p.m. And that's when the involuntary consent was extracted to search his house. So that was almost four hours later. It was certainly if he was going to dry out, that's he should have dried out by that time and if that was even an issue. And then the Miranda waiver, though, didn't come until 930. So it's not a case where he was intoxicated at one point and then it was followed by a waiver. It was actually a coerced consent that followed four hours after the stop and then the interrogation followed a couple of hours after that. There's nothing that intervenes that keep him freeze-dried in this interrogation room under videotape until the detective comes back and then reinitiates their conversation, quote, we'll go over it again like we did before with the other, unquote. That's a reference to the ---- I'm just trying to get the legal principle that on why you couldn't have re-Miranda and why he couldn't waive Miranda. Because basically you're saying that the involuntary consent to search, I think you said involuntary consent to search cannot be followed by a confession. So I take that as your point. I'm trying to explore with you the legal underpinnings for that principle. The legal underpinnings are these. First of all, the State has to point to some evidence of an intervening event that makes the one voluntary and the other one involuntary. There has to be something that transpires. Judge Reimer suggested that it was the sobering up. I think the record's clear that to whatever extent he was intoxicated at 3 p.m., that that's dissipated long before this sequence even starts. So there's no intervening act. And to go further with this, what is the legal underpinning, there is no precedent to precisely guide the Court in this situation. Under Schneckloth v. Bustamante, the Court said that you can look at anything, any of the surrounding circumstances. Neither of us, neither of the parties has been able to find a case where you have a coerced event followed by a supposedly voluntary event. But I would — But not on our part to even review this at any situation? No. Under Schneckloth, the Court has to look at all the events around this, whether this has come up before or not. However, there is a recent case that I think guides the Court to some extent, and that's Maryland v. Schatzer, in which the U.S. Supreme Court answered a longstanding question about the interval between an invocation, a Miranda invocation, and then a voluntary backpedaling or taking it back, a waiver. And what is the space? And it's 14 days, it turns out. But the important thing is to look at the Supreme Court's discussion of the factors that go into that. Number one is the defendant has to be out of custody. He has to go back to his home or be, if he's in custody on something else, he has to go back to his prison cell where he can reassess the situation, maybe consult with an attorney if he feels it's necessary, and just in general get out from under the factors that led him to the first invocation. See, that's why I thought they were related, and you said that we're going to start with the second one first. Excuse me. And that is, I have some trouble treating the first as a valid invocation as much as simply do you understand these rights, and he doesn't understand them. So if he doesn't understand them, I don't think he can invoke, waive, or whatever at that point. The question of the invocation followed by the waiver is a very interesting issue, and it has not been decided yet whether the first invocation has to be clear and unambiguous under Davis v. United States or whether it can be somewhat ambiguous and equivocal. And we just don't know the answer to that. Well, you know what? Maybe we haven't decided it, but certainly in Anderson v. Terhune, we had a very clear statement. None of the statements made here fall within any of our cases that would suggest he'd invoked anything. That's why I'm having some trouble because the language, well, there really isn't any language. Do you understand? He doesn't understand what's going on, so why isn't that sort of game over at that point? And now he has time to sober up, and then he's remirandized. Anderson v. Terhune was a waiver followed by an invocation. This case is an invocation followed by a waiver. So the opposite question is presented, and it's an issue that Judge Hugg pointed out in the DeWeaver decision has not been decided by the United States Supreme Court. In that case, then we go back to Judge Rimer's point about deference, don't we? That's why I chose to address the voluntariness of the confession, because that's something that the United States Supreme Court has ruled on. Thank you. You used up all your time, but I'm going to give you a rebuttal anyway. Thank you so much. Why don't we take a moment and hear from the other side, and then you'll have a chance to come back. Good morning. May it please the Court. Melissa LaPone, Counsel for Respondent, the Warden-Evans. There are two issues before this Court on collateral review. First, did the State appellate court misapply controlling Supreme Court precedent or unreasonably determine the facts upholding the denial of the trial court's confession that the denial of Locke's motion to suppress his confession because he invoked? And second, did the State appellate court misapply controlling Supreme Court precedent or unreasonably determine the facts in upholding the trial court's ruling that Locke's confession was admissible because it was voluntary? And I want to address first the right to remain silent. There is no Supreme Court precedent that says that a metaphorical assertion is sufficient to invoke the right to remain silent. Here, Locke argues that his statement, I did not understand or I wanted to speak to my – I'd like to speak to my daughter, was an invocation. But – and he calls that a metaphor. Well, there's no Supreme Court precedent that says that a metaphor is sufficient to invoke. And as you pointed out, there is no clear invocation like I plead the fifth. There is no invocation. If I tell my 2-year-old, do you want a cookie, and he looks at me and says, I don't understand, I would take his temperature. I would not say – I would not take that response to be, yes, I want a cookie, or no. It would be, what's wrong with you? And that's how the officers took this. He doesn't understand a clear, unambiguous question. We check the no box, and we leave him alone for a while. Clearly, he's too agitated, too drunk, too upset to be able to answer a clear question. So I think under Davis v. United States, the invocation issue here is very clear. He never invoked. It's not even a question that is a – this was some kind of, you know, not clear invocation. There was just no invocation. And if you look at – if you look at what the trial court did, the trial court was very careful and looked at the facts that he never refused to sign a waiver, Deputy Anaya, and that's on page 71 and 72 of the reporter's transcript. Deputy Anaya just marked the no box. It would perhaps be a different situation if he said, I'm not going to sign this waiver. But he did not. Anaya simply stopped the process when he said, I don't understand, which was absolutely proper under these circumstances. The trial court – you know, 28 times to say you could search. And that the actual waiver of Miranda, right to silence, was influenced by that court. Yes. I think that is the argument. And I thought it interesting that counsel said that the people have the burden of showing an intervening event because that's not really – counsel, I think, had it right when they went to the Shencloth factors. That was one factor that the trial court needed to look at in determining the voluntariness of the confession. And the trial court properly looked at it. If you go back to the trial court's transcript, the trial court – and they refer to court reporter's transcript, page 330, that basically petitioner, when they're talking about expanding the consent of the search, petitioner brings up his daughter and the detective says, no, no, we're not talking about her right now. We're talking about the search. So he basically reinitiates and the detective stops him and then comes back later and Mirandizes him. And the court very carefully considered this argument that his will was overborn. And, in fact, if you look at the transcript that's provided with the supplemental excerpts of record, the court says, I don't really think his will was overborn. I think that – and the court actually uses a very – I don't want to call this lazy, but – and you can see where the court is looking at the Fourth Amendment violation and saying, hey, when he said he didn't want his house searched and when he said again, I don't think so, do I have a choice, get a search warrant. Don't be lazy. The Fourth Amendment right and the Fifth Amendment right are different, clearly different in this case. Now, was it a factor to consider under Shencloth that over a 22-minute period of time, 22 minutes videotaped, which the trial court observed, he – Detective Bielcheck asked him 28 times to expand the scope of the consent. Was his will overborn? Well, clearly the trial court felt that he could not – he didn't feel like Detective Bielcheck was listening to him when he said no. And clearly the trial court felt that they should have obtained a search warrant. They had probable cause. The victim told them about the videotapes. They knew where they would be located. You know, the real practical difference is that he's not sitting there thinking, oh, that's the Fourth Amendment and now we're going to move on to the Fifth. I'm talking about the defendant. Sure. So instead, he's sort of been like, can I search, can I search, can I search, and it's like, okay, finally. And then – so what's the difference? Now you've let him do that. Now they want to talk to you. It's like sort of – it's the same deal. You've already sort of let him – you've opened the door, come on in. There's no real difference. So how can he – that really seems to be the intervening point that we don't have in these other cases, where it would be one thing if you didn't have that at all, but it can't be excluded. And when you include it, it's hard to see how that doesn't really tip the scale fairly significantly. Well, Your Honor, I haven't seen any Supreme Court authority that says that this one factor would outweigh any other factor. So I think that the trial court here properly did the weighing process and really looked at that 22-minute period of time. And again, I keep emphasizing that it was 22 minutes. It wasn't – his entire time in custody from the point of being arrested at 345 to the point of being – to giving his confession around 930 was about five and a half hours. You know, it seems to me that the 22 minutes actually cuts the opposite of how you would like to portray it So that seems to me to actually weigh pretty significantly on the other side. Well, I think that if you were the trial court and you were looking at that factor, you could certainly weigh it that direction. But I guess the question here is that did the State appellate court, when looking at that factor, was that an unreasonable determination of the facts? And that's not how the State appellate court or the State trial court viewed that. So in the end, the weighing of the factors you basically think we should treat as factual determination that gets the deference absent it being unreasonable. Yes. I think that under AEDPA, you have to look at that as a factual determination. Now, you could disagree with it. I think reasonable minds could differ. But the fact that it was 22 minutes, I think, is a one. And when you look at it, the court really looked at all of the different factors. And I thought it interesting that counsel brought duty up as a supplemental authority, because when you look at duty, you know, and you compare it to this case, you've got a minor versus a almost 50-year-old man. No prior contacts with law enforcement. This man is a convicted felon. And he's on a warrant for a DUI that he never showed up for court. So he's been through Miranda before. He has prior contacts with law enforcement. He's been through the system. This interrogation, the duty interrogation started at 925 at night and went until 10 in the morning. This is 345 to 930 at night. In duty, he became virtually nonresponsive. This guy is, let me tell you about how loving a daughter is the most natural thing in the world and every father should show their daughter how to have sex and how. I mean, he's locatiously, you know, expanding upon his theory of father-daughter love. There's really no indication that he's hesitant to talk about his relationship with his daughter. In fact, you know, he's calling, hey, Jeff, let me tell you what it's all about. You know, I sat her down when she was six and I said, let's have sex. You know, I know society frowns upon this, but this is what I want to do with you. I mean, he really expands upon his theory. There's no indication that there's unwillingness. Unlike duty where he becomes nonresponsive, he kind of goes blank. English isn't his first language. This man runs an auto shop business. He's an independent businessman. He's middle-aged. He's English appears to be his first language. You know, when you're looking at the voluntariness, what you're really, what the court was really looking at is was this a product of a rational intellect and a free will? Now, one could look at Locke's intellect and wonder if it's tremendously rational, but in his warped view of the world, he's very consistent all the way through. In his mind, it appears to be a rational intellect if you believe in his value system. And it certainly appears to be a product of his free will. He wants to share with this detective his theory about how he and his daughter have this wonderful, loving relationship. So I think that that really factored in. The court looked at these videotapes. The court spent, Judge Urey actually was a very careful, prudential jurist when you read the transcript of this. She really thought about this, looked at the videotapes, and that's one of the reasons why the trial court is given a certain amount of deference with regard to factual findings, because they hear the testimony by the witnesses. They hear the detective's testimony. They watch the videotapes, and they get that hands-on feeling. Was this really a case where the officers were, you know, doing something they shouldn't be doing? And what the judge says is, I don't see any gamesmanship. I saw some gamesmanship with regard to the consent to search, but I didn't see anything with regard to the voluntariness. And you're over your time, so you may want to wrap up. All right. Thank you. If the Court has no further questions, I will just conclude on the briefs at this time.  Thank you. Thank you, Your Honor. I just would like to point out that it's often the case that the defendant is urged to open up, that he, for instance, in a killing, the detective will say, didn't the victim really deserve it? And whereupon the defendant, if he feels that he's trapped already, that there's nothing that he can do to get out of that interrogation. Why would he feel he was trapped already? Because he made what I suggest to the Court is an attempt to assert Miranda at 3.20. But more important, because at 7 p.m., he resisted the consent to search. He fought with the officer, and he was ground down. His will was ground down. What was discovered in the search that made any difference at all in this case? That was the search was a big deal. He knew that they were incriminating tapes in the house, and that's what the police discovered. That's why the two-hour gap. By that time, the officer came back. He was armed with more information, and the defendant knew it. Then no further questions? Thank you. Thank you both, counsel, for your arguments this morning. Locke v. Evans is submitted, and we'll adjourn for the morning.
judges: Hug, Rymer, McKeown